UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | CRIMINAL NO. 22-cr-10123 |
| JIALI WANG<br>Defendant | ) | |

**DEFENDANT JIALI WANG'S SENTENCING MEMORANDUM**

Now comes the Defendant, Jiali Wang, by and through undersigned counsel, and hereby moves this Honorable Court, pursuant to 18 U.S.C. § 3553(a) and the U.S. Sentencing Guidelines, to depart and/or deviate from the applicable guideline range, and impose a sentence as agreed to with the Government pursuant to the provisions of Fed R. Crim. P. 11(c)(1)(C) of time-served (102 days) and nine-months of supervised release (with the condition that Mr. Wang remain confined to his residence 22 hours per day) with credit for any time spent under conditions of home confinement following his plea of guilty.[1] While such a sentence is below the advisory guideline range, it constitutes a serious, significant punishment for a man who has never before been convicted of a crime, who does not speak English, who has not been able to see his family (including his two young children) or his friends that reside in China since his October 14, 2019 arrest, and whose offense is outside the heartland of the applicable offense guideline, U.S.S.G. § 2B1.1. Such sentence would be consistent with other sentences imposed nationwide

[1] Pursuant to the terms of the Plea Agreement, the parties agreed that Mr. Wang "shall receive credit toward his supervised release period for any time following entry of his guilty plea and prior to sentencing during which the Defendant's conditions of pretrial release require home detention consistent with the terms described above." Plea Agreement at ¶ 6. Mr. Wang's conditions of pretrial release were amended to home confinement on August 8, 2022, *see* Dkt. 109.

for similar criminal conduct, *see* 18 U.S.C. § 3553(a)(6) and if imposed would be consistent with the objectives of § 3553(a), and would fulfill the cardinal principle expressed therein that the Court should impose a sentence sufficient, but not more than necessary, to comply with the purposes of § 3553(a).

Indeed, Mr. Wang stands convicted of a serious criminal offense, which he readily acknowledges and for which he has accepted full responsibility. Through the submission of this pleading (and the arguments set forth herein), he does not, in any respect, seek to depreciate or minimize the gravity of the offense or his conduct. The issue now before the Court is what punishment fits the unique facts and circumstances of this matter—what sentence is "sufficient, but not greater than necessary," to meet the goals enumerated in 18 U.S.C. § 3553(a). For all the reasons articulated herein and to be addressed at sentencing, the defense respectfully asks the Court to impose the agreed upon sentence by the parties. Such a sentence properly takes into consideration the fact that the Guidelines substantially overstate the seriousness of the underlying conduct, Mr. Wang's life history, the punishment that has already been inflicted, the adverse effects from the prolonged pre-trial period, and for the reasons set forth by both the Government and counsel in separate sealed submissions.

**I. Personal and family background.**

Mr. Wang is 44 years old and is a citizen of China. PSR ¶ 59. His father was a farmer prior to his passing in 1997, and his mother, who is now 70 years old, continues resides in China. *Id.* In 1992, Mr. Wang married Ms. Jing Guan. PSR ¶ 62. Together, the couple have two children, ages 11 and 7. PSR ¶ 63. As the letters submitted to the Court describe in detail, Mr. Wang has displayed extraordinary compassion, generosity, and civic and charitable commitment throughout his life.

Mr. Wang is a "kindhearted and altruistic individual" who routinely and regularly does good deeds, large and small, without an expectation of anything in return. Letter of Gui Liu, attached hereto as Exhibit 1. ("He always donated funds to support the elders in his village by purchasing them essential items hoping to improve their quality of life."). When a friend's ex-husband was battling leukemia, Mr. Wang allowed "allowed him and his daughter Vivian to stay in one of his apartments free of charge for over two years so he could focus on his health and that Vivian could take care of him." Letter of David Chen, attached hereto as Exhibit 2. He similarly helped reunite a mother and her three children, who lost touch following immigration to the United States. Exhibit 2. Mr. Wang, "underst[anding] the value of family" hosted "family dinners" for the mother and her three children. Exhibit 2. "Through Jiali's efforts, Vicky [Liu]'s children began to rekindle their relationship with her and they also see Jiali as a trusted and respected member of their family." Exhibit 2; *See also* Letter of Vicky Liu, attached here to as Exhibit 3 ("As a result of Jiali Wang's involvement, my relationship with my children have grown closer than ever before. Furthermore, my children see Jiali Wang as a father figure, something they have been missing since the death of their father from leukemia last year."). When his friend's mother needed financial assistance for medical expenses, Mr. Wang was similarly there to help. Exhibit 3 ("I met Jiali Wang during the toughest time in my life. My mother was in need of an important medical procedure and needed a lot of money from me. I was already working seven days a week at the time, but I still did not have enough to cover the outstanding medical expenses. Jiali Wang learned about my struggles, and immediately offered me a helping hand with the medical expenses.").

Even while facing his own difficulties because of the instant charges, Mr. Wang went out of his way to help others:

> In the last six months, Jiali developed a close bond with Vicky's youngest son, Wei Liang Gao, a young man working at the C-Mart Supermarket in Quincy. Wei Liang Gao came to the United States at age 17. Since he does not have a high school diploma or a GED, Wei Liang Gao is only limited to working in low wage service-related jobs. As a mother, Vicky is constantly worried about Wei Liang's future and prays that he can build other skills to find opportunities beyond the low wage positions he has been accustomed to. Jiali decided to mentor Wei Liang by instructing him to use his extra money to fund a Roth Ira to safeguard his future and inspired [him] to seek other opportunities in his free time to build skills and supplement his income.

Exhibit 2.

> Jiali Wang also grew close with my children and became their mentor. In the last few years, Jiali Wang taught my children the ins and outs of the stock market and helped build their first portfolio. Since my children do not have a high school diploma, they can only work in low wage jobs. Jiali Wang's mentorship helped my children start businesses and build their retirement accounts. I want to emphasis that this happen in the last few years, and Jiali Wang only offered mentorship and did not provide any financial support. He only wanted to give them the gift of knowledge.

Exhibit 3.

Indeed, because of Mr. Wang's selfless nature, his friends and family have "coined [him] as the 'most charitable person' in the world." Exhibit 1.

Mr. Wang, however, has faced great difficulty in recent years. On October 14, 2019, he was arrested and charged via criminal complaint with conspiracy to commit securities fraud in violation 18 U.S.C. § 371. *See* Dkt. 1. He was held without bail for more than three months in a foreign country whose language he does not speak. He was ultimately released on January 24, 2020, under conditions of home detention, GPS monitoring, and significant travel restrictions. *See* Dkt. 49.[2] Initially, the curfew allowed Mr. Wang to leave his rented residence for only two hours per day, a condition which was expanded (but not eliminated) once Mr. Wang

[2] Pursuant to the plea agreement, Mr. Wang will not receive any credit for the 9-months that he spent confined to his home for 22 hours per day prior to the entry of his guilty plea. *See* Dkt. 55.

demonstrated compliance with his conditions of release, *see* Dkt. 49 and 67. Further, Mr. Wang was subject to a no-contact order with all potential witnesses that was construed by his counsel based on communications with the prior Assistant United States Attorney to include everyone named in the SEC Complaint, *SEC v. Wang*, 19-cv-12127-WGY (now administratively closed by order of the District Court). As such, Mr. Wang was not allowed to communicate with Vicki Liu his closest friend of several years, who the Government named as a potential witness, and his brother who was named as a defendant in the SEC Complaint. At the insistence of the prior Assistant United States Attorney in charge of the prosecution, for more than two years Mr. Wang was also not allowed to return to the apartment he owns and was residing in at the time of his arrest because the apartment was near his close friend Ms. Liu thus requiring him instead to rent an apartment in a different location.[3] *See* Dkt. 49 at 2; Dkt. 73. As a result of these charges, Mr. Wang has been isolated from his close friends and relatives in China. Most importantly, for more than three years, he has not been able to see his young children who were 4 and 8 when he was arrested. While he communicates with his kids over video chat, that communication is not a substitute for in-person visitation and, accordingly, Mr. Wang reports that the quality of his relationship with his children has diminished substantially. Mr. Wang, who was "an involved parent who did everything for his children," PSR ¶ 63, has, because of these charges, been shut out of their lives. The results of Mr. Wang's confinement to the United States have been devasting on Mr. Wang and his children:

> When Jiali first went to the United States, his two children, one 8 years old and one 4 years old, was when he needed his father to accompany and educate, and Jiali's absence made the children's growth lack of father's love, and the process of life growth had regrets and deficiencies. Every holiday and weekend, watching other

[3] It should be noted that at the request of the undersigned, the current AUSA, James Drabick agreed, subject to conditions, to allow Mr. Wang to return to his home and revive his relationship with Ms. Liu.

> children being accompanied by their parents to play games or participate in activities, children often cry and ask their mother where his father has been and why he has not seen his father for so long. The children's teachers also want to communicate with the father about the child's education, and the mother can only use it to prevaricate in the field. Can Dad accompany us for birthday blowing birthday candles this year? Can you accompany the children to celebrate the Spring Festival together? Mom and dad grow up with their children, which is the most natural thing in the world, the simplest and clearest thing, and now for Jiali and his two children.

Letter of Jiafeng Wang, attached hereto as Exhibit 4.

Mr. Wang's confinement in the United States has similarly had a detrimental impact on his wife, Jing Guan, who has been forced to take care of the couple's two children by herself while returning to work to pay the family's expenses. Exhibit 4 ("my sister-in-law alone brings two young children who are still ignorant, worrying about the children's food, clothing and study, and worrying about the husband who cannot return home. When Jiali was at home, he gave the family living expenses every month, and now the living expenses are gone, the original savings are also spent, the family needs expenses, and Jiali's lawsuit also costs ... Faced with high costs, my sister-in-law had to work part-time while taking care of her two young children."). Mr. Wang's mother, who is now 70 years old, has similarly been devastated by the inability to see her son:

> Jiali has not been able to return home for more than three years, and the most hurt are not only his two young children, but also our elderly mother. My mother is also 73 years old this year, and [says] I miss Wang Jiali all day and night, I can't eat, I can't sleep, I always think about why Jiali never goes home, what is going on, why don't I come back to see, why can't I see each other for more than three years.... When [she] woke up a few days ago, my mother told me that [she] dreamed of Jiali last night, and in [her] sleep, Jiali shook her mother's arm, saying that [he] had just returned from the United States, and [he] was about to say something when [she] woke up, and [she] couldn't sleep anymore.... My mother wiped her tears as she spoke, and asked me to call my brother and ask if [he] was too busy with work to go home. Since my father died of illness 25 years ago, it was our brave and resilient mother who pulled us up for college and higher education. Every bit of our lives is the focus of our mother's attention. Now my brother is stranded in a foreign country, with no relatives, far away from his relatives, my mother is really worried about

> him every day, worrying about him all the time, hoping that he will suddenly one day push the door and enter, shouting "Mom, I'm back!". It was precisely because of her concern for her youngest child that my old mother lost sleep at night and was in a much worse physical condition than before.

Exhibit 4.

Although Mr. Wang's home detention and curfew conditions have been amended as he has demonstrated compliance with them, he has remained isolated in a foreign country and is prohibited from traveling to China to be with his family. He does not speak English, has no real support system in the United States, until recently was barred from seeing his closest friend due to her being a witness, and the few friends that he does have in this District are not a substitute for the substantial familial connections and friendships in China that have withered with the passage of over three years.[4]

Additionally, the stress stemming from this litigation has also had adverse effects on the mental and physical health of Mr. Wang, who has been suffering from insomnia, a hernia condition, seeing a doctor and taking medication for gastroesophageal reflux disease, and who recently had an emergency surgery to remove his appendix. PSR ¶ 65. As a result of these charges, Mr. Wang has "experienced increased stress, agitation, and depressive symptoms," including "suicidal ideation." PSR ¶ 67. Mr. Wang and his family will continue to experience the collateral consequences of his conviction even after his sentence is served. His children's future in China will be burdened by the publicity of their father's arrest and conviction. Mr. Wang's children "will likely be prevented from attending good schools or colleges because of his

[4] As a result of this prejudice and the Government's failure to indict Mr. Wang for 953 days following his arrest, this Honorable Court dismissed the Indictment without prejudice. Pursuant to the terms of the Plea Agreement, Mr. Wang waived his right to appeal this Honorable Court's determination that the Indictment should be dismissed without prejudice.

conviction." PSR ¶ 63.[5] Similarly, based on assessments by Mr. Wang's Chinese counsel, he may face further prosecution in China for the same underlying conduct.

## II. Argument

### *I. General Sentencing Framework*

With the Supreme Court decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007), sentencing options available to district courts have significantly broadened. *See, e.g., United States v. Taylor*, 532 F.3d 68, 69 (1st Cir. 2008). "[O]nce the [guideline sentencing range ("GSR")] is properly calculated, 'sentencing becomes a judgment call' for the court, and the court may construct a sentence varying from the GSR 'based on a complex of factors whose interplay and precise weight cannot even be precisely described.'" *United States v. Innarelli*, 524 F.3d 286, 292 (1st Cir. 2008) (quoting *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008)). To the extent there exist "sound, case-specific reasons" to do so, a sentencing court is authorized to deviate from the guidelines. *Martin*, 520 F.3d at 91. The post-*Gall* sentencing inquiry is "broad, open-ended, and significantly discretionary." *Id.* at 92.

### *II. A downward departure and/or variance is warranted.*

#### *i. The Guideline loss table lacks empirical support, focuses excessively on a single factor – loss or gain – and does not account for circumstance of the offense or the history and personal characteristics of an individual defendant.*

Pursuant to the terms of the plea agreement, the defense agreed not to oppose the Government's calculation, which is predicated on a loss of between $3,500,000 and $9,500,000.

---

[5] *See e.g., https://lvshi.sogou.com/article/detail/8TLCCAMA5LVK.html?sk=feed* ("If the father has a criminal record, it will affect the child's military civilian political review. He cannot join the army, take the civil service exam, apply for bank and state-owned enterprises, and apply for the police academy…").

Based upon a total offense level of 28 and a criminal history category of I, the Probation Department concluded that the guideline imprisonment range is 78 months to 97 months. The guidelines, however, substantially overstate the seriousness of the offense in this case and ignore Mr. Wang's personal history and characteristics as well as the mitigating circumstances of the offense, *see infra* at 19-20.

First, the Guidelines' loss table, a sentencing process driven largely if not exclusively on mathematics ignores many important elements of section 3553(a). This "sentencing by numbers" approach has been criticized by jurists, in part because the historical astronomical increases in the loss table derive from congressional (political) mandate and they lack empirical support:[6]

> Another example of the deviation of the Guidelines from the original goals of the Sentencing Commission—and one more directly relevant to the instant case—is the huge increase in the recommended Guidelines sentences for securities fraud cases. The Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, *but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data*.

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (emphasis added).

"By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *Gupta*, 904 F.Supp.2d at 351; *see id*. ("But if the sentences so calculated are the product of placing an overwhelming emphasis on

[6] The rationale underlying consideration of the GSR established by the guidelines in weighing the §3553(a) factors rests upon the assumption that the Sentencing Commission has "base[d] its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough*, 128 S.Ct. at 574. As such, when a particular guideline at issue lacks empirical support, the logic for a sentence driven by that guideline provision diminishes.

a factor that may be central to some frauds but largely incidental to others, the effect is to create, in the name of promoting uniformity, a sentencing disparity of the most unreasonable kind"); *see also United States v. Corsey*, 723 F.3d 366, 379-80 (2d. Cir. 2013) ("The three sets of amendments to the loss table of the fraud guideline alone have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences. Each of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission.").

Indeed, "since *Booker,* virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in securities fraud cases] and the fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After Booker, 20 FED. SENT. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008); *see also United States v. Herink*, 2012 WL 3112002, at *7 (D. Neb., July 30, 2012) ("The Guidelines calculation, driven as it is by the substantial amount of loss incurred in this case, is one measure of the seriousness of an offense, *but is not always a reliable proxy for the culpability of an individual defendant*. *When losses amount to millions of dollars, the Guidelines' graduated system of increasing culpability aligned with increasing loss is especially skewed*. In this case, the amount of loss was magnified by a combination of factors, many of which were beyond the defendant's control.") (emphasis added).

Second, the underlying conduct here, spoofing, is a crime involving "an aggregate loss amount that is substantial but diffuse." U.S.S.G. § 2B1.1, n. 21(C). As part of the Dodd–Frank Wall Street Reform and Consumer Protection Act, Congress instructed the Commission to "review and, if appropriate, amend the Federal Sentencing Guidelines and policy statements applicable to persons convicted of offenses relating to securities fraud or any other similar provision of law, in order to reflect the intent of Congress that penalties for the offenses under the Guidelines and policy statements appropriately account for the potential and actual harm to the public and the financial markets from the offenses." Pub. L. 111-203 § 1079A(a)(1)(A). As a result, the Sentencing Commission added Application Note 21(C) to U.S.S.G. § 2B1.1, which provides:

> There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted. For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted.

The conduct at issue here, involved "placing small sell orders, often for 100 shares, at exchange venues at prices designed to give a false signal about a security's supply and to drive down the National Best Bid, or prevailing best offer to buy [a thinly traded] security. Once the price was depressed, one or more-conspirators would place a large buy order intended to execute at the depressed price at a non-exchange venue (such as a private market maker), thereby ensuring that the large buy order would not execute against the small sell orders simultaneously placed at exchange venues. Once the large order was executed at the artificially low price, the co-conspirators would cancel their outstanding (manipulative) sell orders, thereby confirming

that the sell orders were not bona fide orders reflecting true market supply." PSR ¶ 19.[7] The Government contends that because of this trading, Mr. Wang's traders manipulated the "securities prices by at least several cents per instance and at times more than $0.25 per instance." PSR ¶ 21.[8] There are no identifiable victims. There is similarly no evidence that absent manipulated prices, the thousands of counterparties would have abstained from trading. This is exactly the situation that "produce[d] an aggregate loss amount that is substantial but diffuse" warranting a departure under Application Note 21(C) to U.S.S.G. § 2B1.1.

Moreover, the Government's model to compute its loss and forfeiture figure of $8,191,874.80 is, as the defense contends, unreliable because it ignores all other market factors - for example, if a coordinating trading event took place at 10 AM that increased the stock's price by 5 cents and a macroeconomic event occurred at 12 PM, that increased the stock's price by $1, the Government's model treats the entire $1.05 gain (if it was sold) as if it was illicit; the Government model also fails to include the decisions to buy or sell a stock made by third parties, instead assuming that 100% of the reasons for a movement of the price of stock is due to the coordinated trading; and the model is not limited to thinly traded stocks, instead including such stocks as Alibaba, Etsy, Carvana, Columbia Sportswear Co., CarGurus, Inc., Cheesecake Factory, Inc, and exchange-traded funds that could not, because of their volume or liquidity, be effected by small offers to buy or sell shares, all of which are inconsistent with the allegations in

[7] Over $6M of such orders were not cancelled and resulted in trades, a fact that distinguishes this case from those where computers cancelled the smaller trades within a micro-second of their being placed.

[8] In its analysis of trades in the Amended Complaint, the SEC notes that the price increases or decreases of securities were only "in part" influenced by the market manipulative trades. *See SEC v. Wang*, Dkt. 19-cv-12127-WGY, Dkt. 74 at 16-57.

the Indictment that the manipulation at issue was of "thinly traded stocks." *See* Dkt. 79 at ¶ 25; *see also* Expert Disclosure of David Tawil, attached hereto as Exhibit 5.

At sentencing, if the Government or Court feel it necessary, in order to further the defendant's challenge to the forfeiture amount sought by the Government, the defense is prepared to offer the testimony of David Tawil, a former hedge fund president and securities trader at Credit Suisse Securities USA, that, in addition to other reasons, the Government's model for calculating the $8,191,874.80 loss and forfeiture figure is flawed because it includes trading in securities that are not "thinly traded"; "that, in light of their particular trading volume, could not be manipulated by multiple one-hundred share orders"; and includes trading "in stocks that were, on the same day, the subject of market-moving news." Exhibit 5. The Government's model for forfeiture also includes significant trading in ETFs as well as high volume stocks like Alibaba which are not consistent with a model that presupposes price movements due to coordinated trading of thinly traded stocks. Importantly, what moves an ETF are price changes to its many underlying stocks or bonds not a small purchase or sale of the ETF itself.

Finally, the guidelines in this case are a poor proxy for the seriousness of the offense. Spoofing is, undoubtedly, outside the heartland of the U.S.S.G. § 2B1.1 guideline, which also encompasses far more egregious offenses including Ponzi schemes, embezzlement, and pump-and-dump schemes. The conduct at the heart of this case, *i.e.*, moving the price of a security by cents for a short period of time, did not cause any financial strain to any known individual, nor did it undermine confidence in the United States securities industry. Any effects on one single counterparty were minimal, especially considering that counterparties made the conscious decision to transact at the price that was offered by Mr. Wang or his traders. Because the Guidelines' "inordinate emphasis … on [loss] amount" yields a sentencing recommendation that

"would be irrational on [its] face," the Court should depart or vary from the applicable Guidelines and/or focus on the 3553(a) factors. *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).

*ii. The nature and circumstances of the offense and the history and characteristics of the Defendant warrant the agreed upon disposition.*

*i. The need to avoid unwarranted sentencing disparities.*

A below-Guidelines sentence for Mr. Wang would fulfill "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18. U.S.C. § 3553(a)(6). Several cases in the United States have involved defendants in similar circumstances to Mr. Wang. Those cases have typically been resolved through civil enforcement proceedings, probationary sentences, and sentences well below the sentencing guideline range. These cases include:

- *In Re Briargate Trading LLC and Eric Oscher*, SEC Administrative File No. 3-16889 – An SEC investigation found that Briargate Trading LLP and co-founder Eric Oscher orchestrated a scheme in which they placed sham orders - spoofs - to create the false appearance of interest in stocks and to manipulate their prices. After entering spoof orders, Oscher placed bona fide orders on the opposite side of the market for the same stocks and took advantage of the artificially inflated or depressed prices. Immediately after the bona fide orders were executed, Oscher canceled the spoof orders. Briargate and Oscher settled the administrative action by agreeing to pay approximately $1 million.

- *SEC v. Lek Securities Corp., et al.*, No. 17-cv-1789 (S.D.N.Y.) – The SEC charged a Ukraine-based trading firm accused of manipulating the U.S. markets hundreds of thousands of times and the New York-based brokerage firm, Lek Securities, and CEO, Samuel Lek. The SEC's complaint alleged that Avalon FA Ltd touted itself to traders as a destination to engage in layering, a scheme in which orders are placed but later canceled after tricking others into buying or selling stocks at artificial prices, resulting in illicit profits. Avalon allegedly made more than $21 million in the layering scheme involving U.S. stocks during a five-year period. Avalon was alleged to have used traders in Eastern Europe and Asia to conduct its trading, and the firm kept a portion of the profits and collected commissions from the traders. The SEC further alleged that Lek Securities and its owner Samuel Lek made the schemes possible by providing Avalon with access to the U.S. markets, approving the cross-market trading scheme, and improving its trading technology to assist Avalon's trading.

  - Lek Securities agreed to pay a $1 million penalty, $525,892 in disgorgement and prejudgment interest, and agreed to a three-year injunction requiring it to terminate business with foreign customers potentially engaged in market manipulation or manipulative trading and largely prohibiting it from providing intra-day trading to foreign customers.
  - Samuel Lek agreed to permanent injunctions from violating the antifraud and manipulative trading provisions of Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933 and agreed to pay a $420,000 penalty.
  - Following a jury trial, Avalon FA Ltd, and its owners Nathan Fayyer and Sergey Pustelnik, were ordered jointly and severally liable for disgorgement of $4,495,564, together with prejudgment interest thereon in the amount of $131,750, for a total of $4,627,314.
  - No criminal charges have been filed against the companies or their owners.

- *SEC v. O'Brien*, No. 21-cv-9575 (S.D.N.Y.) – Between 2015 and 2021, O'Brien simultaneously traded stocks in two or more accounts at separate brokerage firms in a coordinated manner. O'Brien accumulated larger stock positions in one or more accounts at one brokerage firm, and placed smaller orders in the same securities on the opposite side of the market in one or more accounts at a different brokerage firm. O'Brien's effect of placing smaller orders in the helper accounts was to create the appearance of sell-interest in the stock to decrease the price of the security before he acquired his larger positions in the same security. The SEC alleged that over the course of five years, O'Brien conducted more than 19,000 Coordinated Trading Events involving more than 2,200 stocks in 24 accounts at 18 different brokerage firms. The accounts used for his Coordinated Trading Events were in both his and his wife's names. The SEC alleged O'Brien's Coordinated Trading Events resulted in net profits of $6.116 million. The case is currently pending. No criminal charges have been filed.

- *In re Towers Research Capital LLC*, CFTC Docket No. 20-06 – From March 2012 through December 2013, Towers, by and through its traders, on thousands of occasions, placed orders to buy or sell futures contracts with the intent to cancel those orders prior to execution. Towers caused $32,593.849 in market losses. The traders implemented their manipulative and deceptive scheme by placing one or more orders that they wanted filled on one side of the market, typically consisting of passive orders whose quantities are only partially visible to other market participants; and, on the opposite side of the market, placing one or more orders that the traders intended to cancel before execution typically consisting of fully visible passive orders for a larger total quantity. Generally, after receiving a full or partial fill on the genuine orders, the traders then cancelled the spoof orders. In placing the spoof orders, the traders often used an order splitter to enter several smaller, randomly-sized orders to obscure their scheme from other market participants. The traders engaged in this scheme to induce other market participants to trade against their genuine orders—by intentionally sending a false signal to the market that they wanted to buy or sell the number of contracts specified in the spoof orders and creating a false impression of supply or demand—so that the genuine orders would fill sooner, at better prices, or in larger quantities than they otherwise would. Towers was ordered to pay

restitution in the amount of $32,593.849, a fine of $24,400,000, and disgorgement of $10,500,000.

- *United States v. Krishna Mohan*, 18-cr-00610 (S.D.Tex.) – Mohan's direct participation in Towers Trading Team A generated gain of $157,000 and caused market loss of $160,000. Collectively, Trading Team A generated gain of $15,800,000 and caused a market loss of $61,500,000. Mohan was sentence to 1-year probation, $100 special assessment, no restitution, and no fine. Dkt. 23 at 21-22.

- *United States v. Navinder Sarao* 15-cr-00075 (ND. Ill.) – During the period from at least January 2009 through at least April 2014, Sarao used an automated trading program, along with other techniques, to defraud and manipulate the market for E-mini-Standard & Poor's (S&P) 500 futures contracts (E-minis), stock market index futures contracts based on the S&P 500 index, through the Chicago Mercantile Exchange (CME). The E-mini S&P 500 is considered among the most widely traded financial products in the world. Sarao admitted that he placed thousands of orders that he did not intend to trade, or "spoof orders," to create the appearance of substantial false supply and demand and to induce other market participants to trade E-minis at prices, quantities, and/or times that, but for Sarao's spoof orders, they would not otherwise have traded. In thousands of instances, Sarao admitted, he was able to induce other market participants into buying or selling E-minis by placing the spoof orders, which had the additional purpose and effect of artificially depressing or artificially inflating the price of E-minis. Sarao admitted that he was able to make at least $12.8 million in illicit gains. The CFTC alleged that Sarao was at least partially responsible for the May 6, 2010, flash crash, dropping the DOW 600 points.
  - The sentencing guideline was calculated at 28 based on loss of between $9.5 million and $12.8 million, leading to a GSR of 78-97 months. Dkt. 121 at 3-4. Government moved for a 5K1 reduction of 50% based on "extraordinarily timely, substantial, and truthful cooperation". Dkt. 121 at 5.
  - Sarao was sentenced to a term of time served (approximately 4 months) and 1 year of home confinement. Dkt. 121 at 37-38.

- *United States v. Jiongsheng "Jim" Zhao,* 18 cr- 24 (ND. Ill.) – Zhao "was a trader at Propex Derivatives Pty Ltd, a proprietary trading firm based in Sydney, Australia, and he traded from Propex's offices or from his home in Sydney. The defendant traded futures contracts on exchanges located in Australia and the United States, including the Chicago Mercantile Exchange. From approximately July 2012 and continuing through approximately March 2016, the defendant engaged in a trading strategy in which he placed thousands of large-quantity orders on the CME to buy or sell E-mini S&P 500 futures contracts that, at the time he placed the orders, he intended to cancel them before execution … The defendant's Spoof Orders often caused other market participants to react and to trade at prices, quantities, and times that they likely otherwise would not have traded, but for the defendant's Spoof Orders, and which resulted in his Primary Order being filled. Frequently, once the defendant's Spoof Orders served their purpose and his Primary Order was filled, he quickly cancelled the Spoof Orders to ensure that they would not be filled." Dkt. 66 at 2-3. Zhao caused a market loss of $464,000. The GSR was calculated as 30-37 months.

Dkt. 66 at 4. Zhao was sentenced to time served (approximately 10 months while he was awaiting extradition).

- *United States v. James Vorley and Cedric Chanu*, 18-cr-00035 (ND. Ill.) – Vorley and Chanu, who were employed as traders at Deutsche Bank AG—Vorley based in London; Chanu based in London and Singapore— were convicted after trial of engaging in a years-long conspiracy to defraud other traders on the Commodity Exchange Inc., which was an exchange run by the Chicago Mercantile Exchange Group. The defendants and their co-conspirators defrauded other traders by placing fraudulent orders that they did not intend to execute to create the appearance of false supply and demand and to induce other traders to trade at prices, quantities, and times that they otherwise would not have traded. The defendants and their co-conspirators placed such fraudulent and manipulative orders by themselves and in coordination with other traders at Deutsche Bank AG, including each other. Government calculated the market loss at $1.2 million. Dkt. 383 at 13. Both defendants were sentenced to a term of imprisonment of 1 year and 1 day. Dkt. 406.

- *United States v. Coscia*, 14-cr-00551 (ND. Ill.) – Coscia orchestrated a scheme to dupe and trick other traders into trading with him by creating the false impression of significant market demand and supply. His spoofing scheme was premeditated, intentional, and expertly designed to deceive other traders and their algorithms. Defendant took positions in futures contracts that were some of the largest in the world at the time that he traded – positions that were far larger than some of the biggest trading firms in the country. One loop of defendant's trading took place in a minuscule amount of time – about 2/3s of a second – and defendant employed his spoofing scheme day after day for about two months. Other traders who saw defendant's spoofing trades on their screens were shocked at the enormous size of the orders and the flash cancellations. Rather than plead guilty, Coscia went to trial, testified at trial and lied under oath. The court added a 2-point enhancement for obstruction of justice. Dkt. 162 at 22. Coscia was sentenced to a term of imprisonment of 36 months – the longest sentences in any spoofing case. Dkt. 157 at 2.

These cases illustrate that, to avoid a sentencing disparity, a sentence substantially lower than the calculated Sentencing Guideline range is appropriate, particularly given Mr. Wang's relative conduct. Mr. Wang did not speak English, was not trained by United States brokers or highly regulated financial institutions like JP Morgan or Deutsch Bank, did not use complex algorithms, and did not further a financial institution's manipulation strategy or deceive its compliance department. As further detailed below, Mr. Wang made efforts to curb illegal trading in later years, including by warning employees that they should not engage in prohibited illegal transactions, fining traders, and hiring securities experts to educated traders. He similarly has

agreed to forfeit funds to the Government, including substitute assets that were made through legal trading. In short, for the reasons addressed in this memorandum and those that have been presented under seal to this Honorable Court, the sentence agreed to by the parties is consistent with Mr. Wang's conduct and the prior resolutions of similar spoofing cases.

*ii. The nature and circumstances of the offense and the history and characteristics of the defendant support a downward variance.*

While Mr. Wang formed the initial group of traders that engaged in manipulative trading, he did not monitor the group's activities closely, especially in later years. Mr. Wang, travelled extensively during the time of the conspiracy and was away from the office and those traders for significant periods of time. Indeed, between January 1, 2013, and December 31, 2018, excluding any other foreign travel, Mr. Wang spent 634 days in the United States:

| Arrival Date | Departure Date |
|---|---|
| 7/11/2013 | 1/9/2014 |
| 6/6/2014 | 10/31/2014 |
| 7/1/2015 | 8/10/2015 |
| 8/14/2015 | 10/17/2015 |
| 7/29/2016 | 10/23/2016 |
| 9/17/2017 | 11/19/2017 |
| 8/26/2018 | 10/17/2018 |

*SEC v. Wang*, Dkt. 19-cv-12127-WGY, Dkt. 5 at 21. He also did not systematically monitor traders while he was in China in part because the trading in United States stocks occurred at night due to the 12-hour time zone differential. Similarly, Mr. Wang was not fluent in English, and was, for some time, unaware of the trading regulations in the United States that prohibited his trading conduct. Indeed, Mr. Wang was not trained in United States laws and regulations and was not affiliated with any United States financial institutions. He and his traders manually entered and cancelled order, rather than create high-tech trading algorithms. *See supra.*

Additionally, on or about the end of 2015, Mr. Wang explicitly instructed traders in China to comply with SEC regulations, including its anti-spoofing and market manipulation guidelines. *See* Exhibit 6. He hired a securities professor to teach his traders compliance requirements and trading strategies that did not involve manipulation. Mr. Wang fined violators and prohibited them from using trading accounts, which led traders to leave. *See* Exhibit 7; *see also* Exhibit 1 ("Jiali Wang would invite me to serve as a trainer for his team in the topics of compliance, stock trading, and market analysis. Jiali Wang is extremely conscientious, and his method has always been 'meet compliance first before making profit'. Throughout my observation, Jiali Wang always ensure that his staff meet compliance and established clear policies to punish the employees that unintentionally or intentionally violate his rules. I remember there was an employee name Xiaosong Wang who violated his policies. Jiali Wang not only fined him severely (with documentations) and eventually suspended him for a long time."). While Mr. Wang failed to control his co-conspirators and collected profits because of their illegal trading, he was, in earnest, trying to moderate the conduct prior to the charges in the instant case. Indeed, the SEC has not alleged that Mr. Wang engaged in manipulative trading in his personal Charles Schwab account – which had been seized by the SEC and will be used in part to satisfy the forfeiture order in this case.

Mr. Wang also agreed to plead guilty, avoiding what was expected to be a highly complex trial, requiring the parties to spend well over a year and thousands of hours reviewing thousands of transactions and identifying either illicit (*i.e.*, market manipulative) or legitimate (*i.e.,* price discovery) purposes for the transactions. Consistent with his acceptance of responsibility, Mr. Wang agreed to forfeit at least $6.5 million in funds that have been seized by the SEC, but until now the subject of adversarial SEC proceedings. Additionally, the defendant

has, through his agreement, waived any appellate right to respectfully appeal from this Honorable Court's decision to dismiss his Indictment but without prejudice to the Government initiating a new prosecution.

In short, Mr. Wang, who has – other than for the instant charges – lived an admirable life, has fully accepted responsibility, has already suffered severe punishment, which includes being forced to be away from his family, his children, and his closest friends for more than three years, has already experienced being incarcerated while not knowing the language of his fellow prisoners or guards, who was then significantly restricted during much of his multi-year release on conditions of bail, who has already suffered and will continue to suffer collateral consequences because of his conduct, including consequences that will foreseeably affect his children's educational prospects and may result in him facing criminal charges at home. *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). Moreover, the agreed upon disposition is consistent with the sentences imposed by other courts and non-criminal disposition of other traders who engaged in similar or worse conduct.

## III. Conclusion

Mr. Wang has been away from his family and children for more than three years. He has missed important milestones and has caused great hardship to his family. Fully accepting responsibility, Mr. Wang has done everything possible to make amends for his earlier misdeeds in order to be reunited with his family and friends as soon as possible. For all of the foregoing reasons, as well as additional grounds and reasons to be submitted to the Court, the defense respectfully submits that the agreed upon sentence of time-served (102 days) and nine-months of

supervised release (with the condition that Mr. Wang remain confined to his residence 22 hours per day) with credit for any time spent under conditions of home confinement following his plea of guilty, is a fair and just sentence, and no more than necessary given all pertinent facts and circumstances.

Respectfully Submitted,
Jiali Wang
By His Attorneys,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
menemtsev@gmail.com

**/s/ William H. Connolly**
William H. Connolly
BBO # 634501
20 Park Plaza, Suite 1000
Boston, MA 02116
617-542-0200

Dated: November 23, 2022

**CERTIFICATE OF SERVICE**

I, Martin G. Weinberg, hereby certify that on this date, November 23, 2022, a copy of the foregoing documents has been served via Electronic Court Filing system on all registered participants.

**/s/ Martin G. Weinberg**
Martin G. Weinberg